FILED

00 APR 25 AM 10: 38

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STEVEN M. TUCCI,
an individual

               Plaintiff,

v.

SMOOTHIE KING FRANCHISES, INC.,
a Louisiana Corporation, and NICOLE
SKAGGS, an individual.

               Defendants.
_____/

CASE NO. *8:00CV 785-T-12E*

## **COMPLAINT**

    NOW COMES, the Plaintiff, STEVEN M. TUCCI (TUCCI), an individual, and sues Defendants, SMOOTHIE KING FRANCHISES, INC. (SKFI), a Louisiana Corporation, and NICOLE SKAGGS (SKAGGS), an individual, and says as follows:

### JURISDICTION AND VENUE

    1.    This is a civil action arising under the Constitution of the United States within the meaning of 28 USC § 1331, Federal Question through 15 U.S.C.A. §§ 1 et seq., Federal Antitrust Laws.

    2.    The amount in controversy exceeds $75,000 exclusive of interest and costs.

T 3975

3.      This Court, pursuant to 28 USC § 1367, has supplemental jurisdiction over state claims, as they are related to the federal claims and form part of the same case or controversy.

4.      Venue in this judicial district is proper by reason of the fact that Plaintiff, TUCCI, and Defendant, SKAGGS, are located in this District and Defendant, SFKI, is a foreign corporation doing business in Florida, and almost all of the events or omissions giving rise to these claims occurred in this judicial district, all within the meaning of 28 USC §1391.

5.      Defendant, SKFI, at all times relevant maintained its principle office in Kenner, Louisiana, but is a foreign corporation doing business in the state of Florida, including Sarasota County, through its Franchises located in this district, and it has a registered agent in Plantation, Florida.

6.      Defendant, SKAGGS, at all times relevant resided in Sarasota County, Florida.

7.      Plaintiff, TUCCI, at all times relevant resided in Sarasota County, Florida.

## BACKGROUND

8.      In January of 1997, Plaintiff, TUCCI, agreed to participate in the formation of a Florida Corporation, Sarasota Sports, Inc., in which he was to receive a 33 1/3% interest.  Said Corporation was formed in May 1997, to purchase from Defendant, SKFI, a franchise to be located and operated in Sarasota, Florida.

9.      Plaintiff, TUCCI, made approximately $50,000 in cash capital

2

contributions to Sarasota Sports, Inc.

10.    On and about February of 1997, Sarasota Sports, Inc. purchased a franchise from Defendant, SKFI, to own and operate a fruit drink and nutrition store in Sarasota, Florida, which was opened in September 1997.

11.    Defendant, SKAGGS, was instrumental in obtaining the franchise for Sarasota Sports, Inc. from Defendant, SKFI, in that she provided the site selection packages and other required documentation to Defendant, SKFI, (Deposition pages 27 through 32, attached hereto as Exhibit C) on behalf of Brad Long and Eric Long.

12.    Plaintiff, TUCCI, indicated to the managing shareholders of Sarasota Sports, Inc., Brad Long and Eric Long, and to Defendant, SKAGGS, prior to the purchase of the franchise that he was engaged in other business ventures, including a company that prepared and sold vitamin supplements.

13.    Because of his other business ventures, Plaintiff TUCCI, told the managing shareholders of Sarasota Sports, Inc., Brad Long and Eric Long, and Defendant, SKAGGS, that he could not and would not sign any type of non-compete agreement or confidentiality agreement with Defendant, SKFI.

14.    Since June 1998, Plaintiff, TUCCI, has been precluded by the managing shareholders, Brad Long and Eric Long, and Defendant, SKFI, from participating in Sarasota Sports, Inc. and the operation of its Smoothie King franchise in Sarasota, and has also been prohibited from obtaining access to any records, including but not limited to the financial records, of Sarasota Sports, Inc. and the Smoothie King franchise, contrary to the Florida Business Corporation Act,

F.S.A. § 607.1602.

15.    Plaintiff, TUCCI, brought a lawsuit in state court, Twelfth Judicial Circuit, Case No. 98-3474-CA-01, against Sarasota Sports, Inc. and its managing shareholders, Brad Long and Eric Long, for fraud; corporate mismanagement and waste; an accounting; and appointment of a receiver to manage Sarasota Sports, Inc.

16.    As a result of discovery in said state court, Plaintiff, TUCCI, became aware of two documents: 1) "Guaranty Agreement" and "Acknowledgment", dated July 22, 1997, which are alleged to bear Plaintiff's signature on pages 2 and 3, of 3 pages, attached hereto as Exhibit A., and 2) "Guaranty Agreement" and "Acknowledgment", dated March 2, 1998, which are alleged to bear Plaintiff's signature on pages 2 and 3, of 3 pages, attached hereto as Exhibit B.

17.    Both documents attached hereto as Exhibits A & B, bind the signing parties to the non-competition and confidentiality provisions of the Smoothie King Area Development Agreement and/or Franchise Agreement.

18.    Defendant, SKAGGS, signed the documents attached hereto as Exhibits A and B, as a witness to the signatures of the principles.

19.    Defendant, SKAGGS, in her deposition of December 1999, testified she witnessed Plaintiff, TUCCI, signing the documents attached hereto as Exhibit B, (Deposition pages 49 through 52, attached hereto as Exhibit C).

20.    Plaintiff, TUCCI, was on vacation and out of the area, on July 22, 1997, when it is alleged he signed the document attached hereto as Exhibit A.

4

21.    Lorissa Hooper, who was alleged to have been the other party who witnessed the signatures of the principles on the document attached hereto as Exhibit B, has provided a statement (Exhibit D) saying the signatures alleged to be hers on said document were not hers and she had never seen the document before.

22.    Dawn LaBlanc, who notarized the signatures on the documents attached hereto as Exhibit B, has stated in a sworn affidavit (Exhibit E), she was not present when the alleged signatures of Plaintiff, TUCCI, were made and notarized same only because Brad Long said that Plaintiff, TUCCI, had signed them.

23.    Plaintiff, TUCCI, did not sign the documents attached hereto as Exhibits A and B, and did not authorize any other party to sign his name in his stead.

24.    Defendant, SKAGGS, knew or should have known that in order for Plaintiff, TUCCI, to participate in the ownership of the Smoothie King franchise, he would be required to sign the documents attached hereto as Exhibits A and B; though, he had told her he would not and could not sign such documents.

25.    Contrary to the testimony in her deposition, Defendant, SKAGGS, knew that Plaintiff, TUCCI, had not signed the documents attached hereto as Exhibits A and B, and that Plaintiff, TUCCI, had made it absolutely clear that would not sign such documents.  Further, she knew that Lorissa Hooper had not signed as a witness and that Dawn LeBlanc had not notarized said documents in the presence of Plaintiff, TUCCI, because contrary to her testimony, she knew that Plaintiff, TUCCI, did not sign the documents.

26.    After he became aware of the documents' existence in the summer of

5

1998, Plaintiff, TUCCI, communicated to Defendant, SKFI, that his signatures had been forged on the two documents attached hereto as Exhibits A and B.

27.    Upon information and believe, Defendant, SKFI, failed to investigate Plaintiff's allegations that the signatures on said documents were forged or counterfeit or give his allegations any credence.

28.    After he was precluded from participating in the activities of Sarasota Sports, Inc. and the Smoothie King franchise in Sarasota, Plaintiff, TUCCI, independently proposed to Defendant, SKFI, that he, in conjunction with another party, be allowed to purchase and operate Smoothie King franchises in other cities in Southwest Florida, not in direct competition with the franchise in Sarasota, Florida.

29.    Defendant, SKFI, communicated to Plaintiff, TUCCI, it intended to strictly enforce, the terms of the documents attached hereto as Exhibits A and B, and threatened to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, even though Defendant, SKFI, had been informed that the signatures of Plaintiff, TUCCI, had been forged on said documents and that Plaintiff, TUCCI, would never have agreed to same.

30.    Defendant, SKFI, would not discuss the possibility of Plaintiff, TUCCI, in conjunction with other parties, opening Smoothie King franchises, in other cities in Southwest Florida because of the allegations from Defendant, SKAGGS, and Brad Long and Eric Long that Plaintiff, TUCCI, was operating competing businesses to Defendant, SKFI, contrary to the terms and conditions contained in the documents

6

attached hereto as Exhibits A and B.

31.    Plaintiff, TUCCI, and another party, in July 1998, invested in fruit drink and nutrition stores, under the corporate name, R.T. Smoothy's Corp.

32.    Because Defendant, SKFI, threatened to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, Plaintiff, TUCCI, sold his interest in the R.T. Smoothy's store in Bradenton, Florida (over 20 miles from the Sarasota Smoothie King store).  Said store closed as a result and Plaintiff, TUCCI, sustained substantial financial losses as a consequence thereof.

**COUNT I**
**CONSPIRACY IN RESTRAINT OF TRADE**
**VIOLATION OF THE FEDERAL ANTITRUST LAWS**
**AS TO ALL DEFENDANTS**

33.    Plaintiff, TUCCI, realleges paragraphs 1 through 32, above.

34.    Defendant, SKAGGS, witnessed the signatures purported to be those of Plaintiff, TUCCI, on the documents attached hereto as Exhibits A and B, well knowing that the signatures of Plaintiff, TUCCI, were forgeries and counterfeit. Defendant, SKAGGS, by sending the documents, attached hereto as Exhibits A and B, to Defendant, SKFI, acted in concert with Brad Long and Eric Long, to cause financial and emotional damages and injury to Plaintiff, TUCCI.  Their actions permitted Defendant, SKFI, to actively harass and threaten Plaintiff, TUCCI, and prevented Plaintiff, TUCCI, from participating in the ownership, operation and profits of Sarasota Sports, Inc., the Smoothie King franchise in Sarasota, Florida, as well

7

as the R. T. Smoothy's stores.

35.    Defendant, SFKI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B, which based on Plaintiff's allegations to them they knew Plaintiff did not sign, and by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, forced Plaintiff, TUCCI, to desist from owning, operating and participating in the R. T. Smoothy's fruit drink and nutrition stores.

36.    Defendant, SFKI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B, by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store and by harassing employees of the R. T. Smoothy's stores, forced Plaintiff, TUCCI, to shut down a R. T. Smoothy's fruit drink and nutrition store in Bradenton, Florida.

37.    Defendant, SKFI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B, by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, and by harassing employees at the R. T. Smoothy's store, forced Plaintiff, TUCCI, to sell his interest in the in R.T. Smoothy's Corp. at a substantial loss.

38.    The actions by Defendants, SFKI and SKAGGS, and person(s) unknown, was a conspiratorial arrangement in restraint of trade in the fruit drink and nutrition store business in Southwest Florida in violation of 15 U.S.C.A. §§ 1 to 7.

39.    Due to the actions of Defendants, SFKI and SKAGGS, Plaintiff, TUCCI, has been damaged to his substantial financial detriment.

8

WHEREFORE, Plaintiff, TUCCI, demands judgment against Defendants, SKFI and SKAGGS, jointly and severally, pursuant to 15 U.S.C.A. § 15 in an amount threefold of Plaintiff's damages to be determined at trial, together with costs, pre and post judgment interest, attorney's fees, and such other relief as this Court deems just and proper.

## COUNT II
## CONSPIRACY IN RESTRAINT OF TRADE
## VIOLATION OF THE FLORIDA ANTITRUST ACT
## AS TO ALL DEFENDANTS

40.    Plaintiff, TUCCI, realleges paragraphs 1 through 32, and paragraphs 34 through 37, above.

41.    The actions by Defendants, SFKI and SKAGGS, and person(s) unknown, was a conspiratorial arrangement in restraint of trade in the fruit drink and nutrition store business in Southwest Florida in violation of the Florida Antitrust Act, F.S.A. § 542.18 and F.S.A. § 542.19.

42.    Due to the actions of Defendants, SFKI and SKAGGS, Plaintiff, TUCCI, has been damaged to his substantial financial detriment.

WHEREFORE, Plaintiff, TUCCI, demands judgment against Defendants, SKFI and SKAGGS, jointly and severally, pursuant to F.S.A. § 542.22 in an amount threefold of Plaintiff's damages to be determined at trial, together with costs, pre and post judgment interest, attorney's fees, and such other relief as this Court deems just and proper.

## COUNT III
## TORTIOUS INTERFERENCE
## WITH BUSINESS AND BUSINESS RELATIONSHIPS
## AS TO ALL DEFENDANTS

43.     Plaintiff, TUCCI, realleges paragraphs 1 through 32, above.

44.     Defendant, SKAGGS, knowingly and wrongfully in conjunction with Brad Long, Eric Long and person(s) unknown, represented either directly or indirectly, to Defendant, SKFI, that Plaintiff, TUCCI, had signed the documents attached hereto as Exhibits A and B.

45.     Defendant, SKAGGS, by falsely witnessing the signatures of Plaintiff, TUCCI, on the documents attached hereto as Exhibits A and B, well knowing that the signatures alleged to be those of Plaintiff, TUCCI, were not his signatures, by the course of her conduct in conjunction with Brad Long, Eric Long and person(s) unknown, knowingly, willfully and maliciously, without reasonable justification, interfered with the business relationship between Plaintiff, TUCCI, and Defendant, SKFI and between Plaintiff, TUCCI, and R. T. Smoothy's Corp.

46.     Defendant, SFKI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B, which they knew Plaintiff did not sign, and by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store and to make him close the R. T. Smoothy's store, interfered with the business relationship between Plaintiff, TUCCI, and the R. T. Smoothy's Corp. and its shareholders.

47.     As a result of the tortious actions of Defendants, SKFI and SKAGGS,

10

in conjunction with Brad Long and Eric Long, Plaintiff, TUCCI, has been prevented from participating in the ownership, operation and profits of Sarasota Sports, Inc. and the Smoothie King franchise in Sarasota, Florida.

48.    As a result of the tortious actions of Defendants, SKFI and SKAGGS, in conjunction with Brad Long and Eric Long, Plaintiff, TUCCI, has been prevented from the ownership, operation and profits of the R. T. Smoothy's Corp.

49.    Plaintiff, TUCCI, has been damaged thereby, to his severe and substantial financial detriment.

WHEREFORE, Plaintiff, TUCCI, demands judgment against Defendants, SKFI and SKAGGS, jointly and severally, for damages to be determined at trial, together with costs, pre and post judgment interest and such other relief as this Court deems just and proper.

## COUNT IV
## CONSPIRACY TO DEFRAUD
## AS TO ALL DEFENDANTS

50.    Plaintiff, TUCCI, realleges paragraphs 1 through 32, above.

51.    Defendant, SKAGGS, by falsely witnessing the alleged signatures of Plaintiff, TUCCI, on the documents attached hereto as Exhibits A and B, when she knew Plaintiff, TUCCI, did not sign said documents, in conjunction with Brad Long, Eric Long and person(s) unknown, defrauded Plaintiff, TUCCI, by assuring him he could participate in the ownership, operation and profits of Sarasota Sports, Inc. and the Smoothie King franchise in Sarasota, Florida without having to sign any type of non-compete agreement or confidentiality agreement with Defendant, SKFI.

11

52.     Defendant, SFKI, defrauded Plaintiff, TUCCI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B, which they knew Plaintiff did not sign, and by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, forcing Plaintiff, TUCCI, to desist from owning and operating, in conjunction with others, R. T. Smoothy's fruit drink and nutrition stores.

53.     Defendant, SFKI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B, and by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, forced Plaintiff, TUCCI, and others, to shut down the R. T. Smoothy's fruit drink and nutrition store in Bradenton, Florida.

54.     Defendant, SKFI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B, and by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, forced Plaintiff, TUCCI, to sell his interest in the in R.T. Smoothy's Corp. at a loss.

55.     The actions by Defendants, SFKI and SKAGGS, was a conspiracy to defraud Plaintiff, TUCCI, of his ability to participate in the ownership and operation of fruit drink and nutrition stores in Southwest Florida.

56.     Due to the actions of Defendants, SFKI and SKAGGS, Plaintiff, TUCCI, has been damaged to his severe financial detriment.

WHEREFORE, Plaintiff, TUCCI, demands judgment against Defendants, SKFI and SKAGGS, jointly and severally, for damages to be determined at trial,

together with costs, pre and post judgment interest and such other relief as this Court deems just and proper.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AS TO ALL DEFENDANTS

57.    Plaintiff, TUCCI, realleges paragraphs 1 through 32, above.

58.    Defendant, SKAGGS, knowingly and wrongfully in conjunction with Brad Long, Eric Long and person(s) unknown, represented either directly or indirectly, to Defendant, SKFI, that Plaintiff, TUCCI, had signed the documents attached hereto as Exhibits A and B when she he had not signed them and that the signatures were forged and counterfeit.

59.    Defendant, SKAGGS, by falsely witnessing that the signatures on the documents attached hereto as Exhibits A and B were those of the Plaintiff, TUCCI, when she knew they were not his signatures, in conjunction with Brad Long, Eric Long and person(s) unknown and Defendant, SFKI, prevented Plaintiff, TUCCI, from participating in the ownership, operation and profits of Sarasota Sports, Inc. and the Smoothie King franchise in Sarasota, Florida.

60.    Defendant, SFKI, by threatening to enforce the terms of the documents attached hereto as Exhibits A and B which they knew Plaintiff did not sign, and in conjunction with Defendant, SKAGGS, Brad Long, Eric Long and person(s) unknown, by threatening to take action to divest Plaintiff, TUCCI, of his interest in the Sarasota Smoothie King store, prevented Plaintiff, TUCCI, from the ownership, operation and profits of the R. T. Smoothy's Corp.

13

61.     As a result of Defendants, SKFI and SKAGGS, actions, Plaintiff, TUCCI, has suffered mental grief, pain and suffering, anxiety, stress, loss of appetite, inability to sleep, marital problems which were not pre-existing and deterioration of his normal ability to enjoy life.

WHEREFORE, Plaintiff, TUCCI, demands judgment against Defendants, SFKI and SKAGGS, jointly and severally, for damages to be determined at trial, together with costs, pre and post judgment interest and such other relief as this Court deems just and proper.

COUNT VI
VIOLATION OF FLORIDA BUSINESS CORPORATION ACT
F.S.A. § 607.1602 AND F.S.A. § 607.1620
AS TO DEFENDANT SKFI

62.     Plaintiff, TUCCI, realleges paragraphs 1 through 32, above.

63.     Since June 1998, Plaintiff, TUCCI, has been precluded by the managing shareholders, Brad Long and Eric Long and Defendant, SKFI, from participating in Sarasota Sports, Inc. and the Smoothie King franchise in Sarasota, Florida, that it owns and operates, and as a 33 1/3% shareholder has also been prohibited from obtaining access to any records, including but not limited to the financial records, of Sarasota Sports, Inc. and the Smoothie King franchise, contrary to the Florida Business Corporation Act, F.S.A. § 607.1602.

64.     Since June 1998, Plaintiff, TUCCI, has been precluded by the managing shareholders, Brad Long and Eric Long and Defendant, SKFI, from participating in Sarasota Sports, Inc. and the Smoothie King franchise in Sarasota,

14

Florida, that it owns and operates, and as 33 1/3% shareholder has not received

financial statements of Sarasota Sports, Inc. and the Smoothie King franchise, in

violation of the Florida Business Corporation Act, F.S.A. § 607.1620.

65.    Due to the actions of Defendant, SFKI, Plaintiff, TUCCI, has been

unable to attain financial information (K-1's, etc.) to file his federal income taxes and

has been damaged to his financial detriment.

WHEREFORE, Plaintiff, TUCCI demands judgment against Defendant, SFKI,

for damages to be determined at trial, together with costs, pre and post judgment

interest and an order to Defendant, SFKI, to furnish the financial statements

demanded and such other relief as this Court deems just and proper.

Respectfully submitted,

W. R. Klein, P.A.

William Randolph Klein, Esquire
Florida Bar No.: 211265
1900 Main Street, Suite 310
Sarasota, FL 34236
941 365-1930
Fax: 941 953-3685
Attorney for TUCCI

# GUARANTY AGREEMENT

IN CONSIDERATION of the acceptance by Smoothie King Franchises, Inc., a Louisiana corporation having its principal place of business at Kenner, Louisiana (hereinafter called "Franchisor") of a Franchise Agreement dated March 24, 1997 and/or an Area Development Agreement dated March 24, 1997 executed by BRAD E. LONG (hereinafter called "Developer/Franchisee"), and for other good and valuable consideration, I, we, and each of us solidarily, jointly and severally, absolutely and unconditionally guarantee to Franchisor, (i) the payment and satisfaction of each and every claim, demand, default, liability, indebtedness, right or cause of action of every nature whatsoever, against said Developer/Franchisee, including expenses, damages and fees, now or hereafter existing, due, or to become due, or held by Franchisor, its subsidiaries, affiliates or divisions, together with any interest as it may accrue and if this continuing guaranty is placed with an attorney or if collected by suit or through any probate, bankruptcy or other court, to pay all court costs and reasonable attorney's fees, together with any and all expenses incurred by Franchisor or its affiliates, subsidiaries or divisions; and (ii) the timely performance of each term, covenant, and obligation of the Developer/Franchisee set forth in the Area Development Agreement and/or Franchise Agreement. The undersigned specifically acknowledge that Franchisor is allowing the undersigned to enter into this Guaranty Agreement instead of individually executing the Area Development Agreement and/or Franchise Agreement as a matter of convenience to the undersigned, and the undersigned agree to be bound by the provisions of the Area Development Agreement and/or Franchise Agreement relating to non-competition and confidentiality as if those provisions were fully set forth herein. This is a continuing guaranty which shall apply to the Area Development Agreement and/or Franchise Agreement and any subsequent amendments or modifications thereof, and such modifications or amendments shall be conclusively presumed to be covered by this guaranty without further notice to or acceptance by the undersigned.

The undersigned acknowledge and agree that possession of this guaranty by Franchisor constitutes true and correct execution and actual and proper delivery of same to Franchisor and the undersigned waive notice of acceptance of the guaranty and of any liability to which it applies or may apply, and waive presentment and demand for payment thereof, notice of dishonor or non-payment thereof, collection thereof including any notice of default in payment thereof or other notice to, or demand of payment therefor on, any party. Payment by the undersigned shall be made at the office of Franchisor in Kenner, Louisiana, or such other location as Franchisor may designate in writing.

Franchisor may, at its option, at any time without the consent of or notice to the undersigned, without incurring responsibility to the undersigned, and without any terms or conditions and in whole or in part, (1) change the manner, place or terms of payment or change or extend the time of payment of, renew, or alter any liability of the Developer/Franchisee under the Area Development Agreement and/or Franchise Agreement hereby guaranteed, or any liabilities incurred directly or indirectly hereunder, and the guaranty herein made shall apply to the liabilities of the Developer/Franchisee, so changed, extended, renewed or altered; (2) exercise or refrain from exercising any rights against Developer/Franchisee or others, or otherwise act or refrain from acting; (3) settle or compromise any liabilities hereby guaranteed or hereby incurred, and may subordinate the payment of all or any part of such liabilities to the payment of any liabilities which may be due to Franchisor or others; and (4) apply any sums paid to any liability or liabilities of Developer/Franchisee to Franchisor regardless of what liability or liabilities of Developer/Franchisee to Franchisor remain unpaid. Franchisor, may, at its option, without the consent of or notice to the undersigned, apply to the payment of the liability created by this guaranty, at any time after such liability becomes payable, any monies, property, or other assets belonging to the undersigned in the possession, care, custody and control of the Franchisor.

GA- 03/97
Tucci/Long

* 1 *

EXHIBIT

tabbies

A

This agreement shall not affect in any manner the right of the Franchisor to terminate the Area Development Agreement and/or Franchise Agreement pursuant to the terms thereof and this guaranty shall survive the termination, expiration or cancellation of the Area Development Agreement and/or Franchise Agreement. Franchisor may, at its option, elect to take no action pursuant to this guaranty or the Area Development and/or Franchise Agreement without waiving any rights under either. The undersigned do further agree that it will not be necessary for Franchisor, in order to enforce the terms of this Agreement against them, to first institute suit or exhaust its remedies against the Developer/Franchisee or any others. The foregoing guaranty shall be irrevocable, except with the express written consent of the Franchisor.

The undersigned, if more than one, shall be solidarily and jointly and severally liable hereunder and the term "undersigned" shall mean the undersigned or any one or more of them. Anyone signing this guaranty shall be bound thereto at any time. Any married person who signs this guaranty hereby expressly agrees that recourse may be had against his or her separate property for all his or her obligations under this guaranty.

This guaranty shall bind and inure to the benefit of the heirs, executors, administrators, successors and assigns of Franchisor and the undersigned. This agreement in the possession of the Franchisor will be presumed that same has been executed and delivered by each of the undersigned for a valuable consideration.

WITNESS our hands at _____, on this the _22_ day of ___Tuly___, 19_92_.

WITNESSES:

_Nicolle M. Skaggs_

_Carl L. D'Orazio_

_Sh M. Tucci_
Steven M. Tucci
Owner of 3̶0̶% interest in Developer/Franchisee
33%

ACCEPTED BY:
Smoothie King Franchises, Inc.

By:_____
Joseph M. Lewis, President

# ACKNOWLEDGMENT

STATE OF ___Florida___

PARISH/COUNTY OF ___Sarasota___

BEFORE ME, the undersigned authority, duly commissioned, qualified and sworn within and for the State and Parish/County aforesaid, personally came and appeared **STEVEN M. TUCCI**, who being by me first duly sworn, did depose and say:

That appearer(s) is/are the identical person(s) who executed the foregoing **GUARANTY AGREEMENT** and that appearer(s) executed said instrument of appearer's(s') own free will and accord for the uses, purposes and benefits therein expressed.

IN WITNESS WHEREOF, said appearer(s) has/have executed this acknowledgment in my presence and in the presence of the undersigned competent witnesses on this ___22___ day of ___July___, ~~1997~~.

WITNESSES:

___Nicole N. Skaggs___

___Carol L. O'Neill___

BY: X ___Steven M. Tucci___
Steven M. Tucci

___
NOTARY PUBLIC

My commission expires ___12/21/97___



BRAD E. LONG
MY COMMISSION # CC 357541
EXPIRES: December 21, 1997
Bonded Thru Notary Public Underwriters

SEAL

GA- 03/97
Tucci/Long

* 3 *

# GUARANTY

In consideration of Franchisor executing the foregoing Transfer of Franchise and Development Agreement transferring the Franchise and Development Agreement to SARASOTA SPORTS, INC. ("Developer/Franchisee"), dated ____5____ _____2_____, 19 98, and for other good and valuable consideration, I, we, and each of us solidarily, jointly and severally, absolutely and unconditionally guarantee to Franchisor, (i) the payment and satisfaction of each and every claim, demand, default, liability, indebtedness, right or cause of action of every nature whatsoever, against said Developer/Franchisee, including expenses, damages and fees, now or hereafter existing, due, or to become due, or held by Franchisor, its subsidiaries, affiliates or divisions, together with any interest as it may accrue and if this continuing guaranty is placed with an attorney or if collected by suit or through any probate, bankruptcy or other court, to pay all court costs and reasonable attorney's fees, together with any and all expenses incurred by Franchisor or its affiliates, subsidiaries or divisions; and (ii) the timely performance of each term, covenant, and obligation of the Developer/Franchisee set forth in the Area Development Agreement and/or Franchise Agreement. The undersigned specifically acknowledge that Franchisor is allowing the undersigned to enter into this Guaranty Agreement instead of individually executing the Area Development Agreement and/or Franchise Agreement as a matter of convenience to the undersigned, and the undersigned agree to be bound by the provisions of the Area Development Agreement and/or Franchise Agreement relating to non-competition and confidentiality as if those provisions were fully set forth herein. This is a continuing guaranty which shall apply to the Area Development Agreement and/or Franchise Agreement and any subsequent amendments or modifications thereof, and such modifications or amendments shall be conclusively presumed to be covered by this guaranty without further notice to or acceptance by the undersigned.

The undersigned acknowledge and agree that possession of this guaranty by Franchisor constitutes true and correct execution and actual and proper delivery of same to Franchisor and the undersigned waive notice of acceptance of the guaranty and of any liability to which it applies or may apply, and waive presentment and demand for payment thereof, notice of dishonor or non-payment thereof, collection thereof including any notice of default in payment thereof or other notice to, or demand of payment therefor on, any party. Payment by the undersigned shall be made at the office of Franchisor in Kenner, Louisiana, or such other location as Franchisor may designate in writing.

Franchisor may, at its option, at any time without the consent of or notice to the undersigned, without incurring responsibility to the undersigned, and without any terms or conditions and in whole or in part, (1) change the manner, place or terms of payment or change or extend the time of payment of, renew, or alter any liability of the Developer/Franchisee under the Area Development Agreement and/or Franchise Agreement hereby guaranteed, or any liabilities incurred directly or indirectly hereunder, and the guaranty herein made shall apply to the liabilities of the Developer/Franchisee, so changed, extended, renewed or altered; (2) exercise or refrain from exercising any rights against Developer/Franchisee or others, or otherwise act or refrain from acting; (3) settle or compromise any liabilities hereby guaranteed or hereby incurred, and may subordinate the payment of all or any part of such liabilities to the payment of any liabilities which may be due to Franchisor or others; and (4) apply any sums paid to any liability or liabilities of Developer/Franchisee to Franchisor regardless of what liability or liabilities of Developer/Franchisee to Franchisor remain unpaid. Franchisor, may, at its option, without the consent of or notice to the undersigned, apply to the payment of the liability created by this agreement, at any time after such liability becomes payable, any monies, property, or other assets belonging to the undersigned in the possession, care, custody and control of the Franchisor.

This agreement shall not affect in any manner the right of the Franchisor to terminate the Area Development Agreement and/or Franchise Agreement pursuant to the terms thereof and this guaranty shall



EXHIBIT

B

survive the termination, expiration or cancellation of the Area Development Agreement and/or Franchise Agreement. Franchisor may, at its option, elect to take no action pursuant to this guaranty or the Area Development and/or Franchise Agreement without waiving any rights under either. The undersigned do further agree that it will not be necessary for Franchisor, in order to enforce the terms of this Agreement against them, to first institute suit or exhaust its remedies against the Developer/Franchisee or any others. The foregoing guaranty shall be irrevocable, except with the express written consent of the Franchisor.

The undersigned, if more than one, shall be solidarily and jointly and severally liable hereunder and the term "undersigned" shall mean the undersigned or any one or more of them. Anyone signing this guaranty shall be bound thereto at any time. Any married person who signs this guaranty hereby expressly agrees that recourse may be had against his or her separate property for all his or her obligations under this guaranty.

This guaranty shall bind and inure to the benefit of the heirs, executors, administrators, successors and assigns of Franchisor and the undersigned. This agreement in the possession of the Franchisor will be presumed that same has been executed and delivered by each of the undersigned for a valuable consideration.

WITNESS our hands at _____ on this the 25 day of
February _____ 19 97

WITNESSES:

_____                    _____
                                                     Brad Long
                                                     Owner of 67% interest in Developer/Franchisee

_____                    _____
                                                     Steven M. Tucci
                                                     Owner of 33% interest in Developer/Franchisee


                                                     ACCEPTED BY:
                                                     Smoothie King Franchises, Inc.

_____                    _____
Barbara Robertson                                    By: Joseph R. Martin, President
Vanessa Woolley

                                                     Date: 3-3-11

# ACKNOWLEDGMENT

STATE OF _____Florida_____

PARISH/COUNTY OF _____Sarasota_____

BEFORE ME, the undersigned authority, duly commissioned, qualified and sworn within and for the State and Parish/County aforesaid, personally came and appeared BRAD E. LONG and STEVEN M. TUCCI who being by me first duly sworn, did depose and say:

That appearer(s) is/are the identical person(s) who executed the foregoing TRANSFER OF FRANCHISE and DEVELOPMENT AGREEMENT and GUARANTY; that appearer(s) executed said instrument of appearer's(s') own free will and accord for the uses, purposes and benefits therein expressed.

IN WITNESS WHEREOF, said appearer(s) has/have executed this acknowledgment in my presence and in the presence of the undersigned competent witnesses on this ____25____ day of _____February_____ 19 98 .

WITNESSES:

BY: _____
Brad E. Long

BY: _____
Steven M. Tucci

_____
NOTARY PUBLIC

My commission expires ____7/20/98____

DAWN G. LeBLANC
Notary Public, State of Florida
My Comm. Expires July 20, 1998
No. CC 5_____
Bonded Thru Official Notary Service

SEAL

* 3 *

1          IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
                      IN AND FOR SARASOTA COUNTY
2                                FLORIDA

3

4

5     STEVEN M. TUCCI, MARI E.          )
      TUCCI and SARASOTA SUNCOAST       )
6     CENTER, INC.,                     )
                                        )
7                    Plaintiffs,        )
                                        )  Case No. 98-3474
8              vs                       )             CA-01
                                        )
9     ERIC F. LONG, BRAD E. LONG,       )
      THE LONG PROPERTY GROUP,          )
10    INC., SARASOTA SPORTS, INC.,      )
      and TU-LONG, INC.,                )
11                                      )
                     Defendants,        )
12    ==============================/

13

14      DEPOSITION OF:      NICOLE SKAGGS

15      DATE:               7 December 1999

16      TIME:               9:00 A.M.

17      PLACE:              LAW OFFICE OF WILLIAM R.
                            KLEIN, ESQ.
18                          1900 Main Street
                            Sarasota, Florida
19
        PURSUANT TO:        Notice of Counsel for
20                          Plaintiff for purposes of
                            discovery and/or evidence,
21                          pursuant to applicable and
                            governing rules
22
        BEFORE:             ELEANOR C ANDRESEN
23                          Carpenter Court Reporting
                            P.O. BOX 49341
24                          Sarasota, Florida 34230

25

EXHIBIT C

1    wouldn't let them put it in?

2             A.    I don't have further knowledge of that.

3             Q.    Who would?

4             A.    Brad.

5             Q.    Let's talk about Smoothie King.  Sarasota

6    Sports, is that a corporation?

7             A.    Correct.

8             Q.    And do you know when that was set up?

9             A.    No, I do not know the exact date.

10            Q.    Let me back up.  Did you have any role

11   involving Smoothie King?  Did you work for them?  Did

12   you have an interest in the company?  Were you employed

13   by them in the sense of being an outside employee doing

14   bookkeeping?

15            A.    Stop!  That's a lot of questions.  No, I

16   had no interest in the corporation.  Yes, as a friend,

17   as an employee of Long Property Group, I did some work

18   for Smoothie King gratis.  And then later on I was

19   physically in the store.

20            Q.    What was the gratis work you did?

21            A.    Site selection packages that needed to be

22   sent to national prior to moving our offices.

23            Q.    Would you explain that to me?

24            A.    A site selection package requires one to

25   go out and do a full accounting of the center, to do

1      interviews at the center, to get traffic counts, to put

2      together a map with all the schools and what not.  The

3      site has to be approved by national.

4           Q.    This was done before there was any store?

5           A.    Correct.

6           Q.    Who set up the corporation, if you know?

7           A.    I don't know.

8           Q.    Was the corporation in existence at the

9      time you went to work for Long Property Group?

10          A.    I do not believe so.

11          Q.    Do you know who set up the corporation?

12          A.    I do not know.

13          Q.    Do you know what attorney set it up?

14          A.    I do not know.

15          Q.    Do you know who the accountant was for

16     the corporation?

17          A.    I do not know.

18          Q.    In all the work you did for Smoothie King

19     Corporation, did you ever submit any documentation to

20     any accountant for any kind of work?

21          A.    During the entire time I was with Long

22     Property Group?  Yes, I did, towards the end.

23          Q.    Who did you submit that accounting

24     information to?

25          A.    Stephen Musco.

1      Q.    Anyone else?

2      A.    Harshman.  Hawkins.

3      Q.    And Hawkins.  Do you know if the Long

4    Property Group is still in existence today?

5      A.    I do not believe it is.

6      Q.    Do you know when it ceased existing?

7      A.    No, I do not.

8      Q.    How long were you involved with Smoothie

9    King?

10     A.    December 1997 through July 1999.

11     Q.    What happened July 1999?

12     A.    I left the employment of Long Property

13    Group.

14     Q.    May I ask why?

15     A.    I had a better opportunity.

16     Q.    What were those better opportunities?

17           MR. HAMMERSLEY:  What difference does it

18        make?

19     A.    I was put in charge of leasing a new

20    office tower in Sarasota.

21     Q.    Of whom?

22     A.    Of a new office tower in Sarasota.

23     Q.    When you did work for Smoothie King, I

24    know you said you did some work gratis.  The work you

25    did not do gratis, were you paid for that work?

30

1        A.    Yes.  But I did more than some work

2   gratis.  I did quite a lot of work gratis.

3        Q.    Besides the site planning and surveys and

4   everything else, what else did you do for Smoothie

5   King?

6        A.    Administrative support.

7        Q.    What did that encompass?

8        A.    Secretarial.

9        Q.    Any bookkeeping?

10       A.    No.

11       Q.    Anything involving the numbers of the

12  financial statements of the company?

13       A.    No.

14       Q.    Anything involving compliance with the

15  national franchisor's requirements?

16       A.    Yes.

17       Q.    What were those?

18       A.    Site selection packages.

19       Q.    The site selection, did this involve

20  other sites, or just the site that Smoothie King was

21  located at Paradise Plaza?

22       A.    Other sites as well.

23       Q.    Did this Smoothie King company, the local

24  one in Sarasota Sports, did that open any other sites?

25       A.    No.

1          Q.    Do you know what the franchisor required

2    to be submitted to it by the corporation, the local

3    corporation?

4          A.    No, not a complete listing, no.

5          Q.    What do you know that had to be

6    submitted?

7          A.    Traffic count, interviews.

8          Q.    How is the traffic count done?

9          A.    We called the traffic engineer, city

10   traffic engineer and got his spread sheet.

11         Q.    This is a traffic count of cars going by

12   as opposed to people coming in the store?

13         A.    Correct.

14         Q.    This was done on a monthly basis or

15   yearly basis?

16         A.    No, this was done in order that Smoothie

17   King would approve or disapprove the site that was

18   selected for the original store.

19         Q.    What else had to be submitted to the

20   company?

21         A.    The map with the schools and the airport

22   and the library on it.

23         Q.    What else?

24         A.    The interviews.

25         Q.    What interviews?

1          A.      Interviews with people around the plaza,

2    tenants.  It's an entire package that corporate

3    requires.

4          Q.      Did there come a time when the national

5    franchisor issued a franchise to Sarasota Sports?

6          A.      Yes, I believe they did.

7          Q.      Do you know when that happened?

8          A.      No, I don't know the exact date.

9          Q.      And did there come a date when the store

10   opened?

11         A.      Yes.

12         Q.      Do you recall approximately when that

13   was?

14         A.      Around about September 1997.

15         Q.      After the store opened was the store

16   required to submit reports or information to the

17   national franchisor?

18         A.      That's correct.

19         Q.      What did they have to submit -- let me

20   make it easier for you:  Were there things on a weekly

21   basis that had to be submitted?

22         A.      There are daily records that must be

23   kept.  There are weekly records that must be kept.

24   There are monthly records.  There is an entire book

25   that you can get from the franchisor.

```
 1                    THE WITNESS:  That's Brad Long's.
 2                    MR. KLEIN:  That's his signature; right?
 3                    THE WITNESS:  Correct.
 4                    MR. HAMMERSLEY:  Let the record reflect
 5               when you first asked her she was giving you
 6               the name of the witness below, and not the
 7               name signed above Brad Long's printed name.
 8          Q.    Who was Lorrissa Hooper?
 9          A.    She was an employee of Long Property
10     Group.
11          Q.    Do you see the signature underneath --
12     did you see Brad Long sign that?
13          A.    Correct.
14          Q.    You were present at that date?
15          A.    Correct.
16          Q.    Underneath that we have Steven M. Tucci?
17          A.    Correct.
18          Q.    Did you see him sign that?
19          A.    Correct.
20          Q.    That is his signature?
21          A.    Correct.
22          Q.    And you've witnessed that to the left;
23     right?
24          A.    To the left; correct.
25          Q.    And that signature under your signature,
```

1      is that also Lorrissa Hooper?

2              A.      I believe it is.

3              Q.      Below that we have accepted by Smoothie

4      King Franchise, Inc., right?

5              A.      Yes.

6              Q.      Do you know whose signature that is?

7              A.      No, sir, I have no idea.

8              Q.      Do you know who those witnesses on the

9      left are?

10             A.      No, I do not.

11             Q.      Do you know if that date 3/2/98 is the

12     date they signed it?

13             A.      No, I do not.

14             Q.      Let's go to the next page.  The next page

15     is an acknowledgement?

16             A.      Correct.

17             Q.      And what is this acknowledgement?  Do you

18     know what an acknowledgement is?  Just generally if you

19     know what it is.  I'm not going to ask you about the

20     contents of it.

21             A.      Generally, I know what an acknowledgement

22     is.

23             Q.      Page 3, there's an acknowledgement of a

24     notary as to signatures of Brad Long and Steven Tucci;

25     correct?

```
 1              A.    Correct.

 2              Q.    What is the date of that?

 3              A.    It appears 25th day of February 1998.

 4              Q.    That's the same date as on Page 2; right?

 5              A.    Correct.

 6              Q.    Is there a signature there of Brad Long?

 7              A.    Yes, there is.

 8              Q.    Who witnessed that?

 9              A.    I did.

10              Q.    And Lorrissa Hooper?

11              A.    It appears.

12              Q.    Underneath that there's signature of

13      Mr. Tucci?

14              A.    Correct.

15              Q.    Did you see him sign that?

16              A.    Correct.

17              Q.    Whose signature is that to the left?

18              A.    That would be mine.

19              Q.    Whose name under that?

20              A.    Would be Lorrissa Hooper.

21              Q.    Who notarized this?

22              A.    It appears to be Dawn G. LeBlanc.

23              Q.    Do you know who Dawn G. LeBlanc is?

24              A.    Yes, I do.

25              Q.    Was she present when Brad Long signed
```

1       this acknowledgement?

2              A.      I'm not aware.  I witnessed their

3       signatures.  I was not in the room at the time.

4              Q.      When you witness a signature - okay, when

5       Mr. Tucci signed this Page 3 were you in the room then?

6              A.      Correct.

7              Q.      Was Dawn LeBlanc there?

8              A.      I don't believe she was.

9              Q.      Do you know who she is at all?

10             A.      I do know.

11             Q.      Who is she?

12             A.      She was a legal assistant for Carl

13      Patrick.

14             Q.      Was she a legal assistant for Carl

15      Patrick at that time?

16             A.      I believe she was.

17             Q.      Do you know if there ever was any money

18      accounting made between Brad Long and Dr. Tucci

19      regarding the profits of the company?

20             A.      Can you restate that?

21             Q.      Was there ever any money accounting?

22      What I mean by accounting, did Dr. Tucci ever share in

23      any of the profits of the Smoothie King store?

24             A.      Unfortunately, there were no profits.

25             Q.      Do you know how much business the

**McHargue & Associates**
**Investigative Services**

STATEMENT OF: Lorissa L. Hooper                                    . PAGE 1  OF 1

1    My name is Lorissa Hooper. My date of birth is
2   6/30/79. My social security number is 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.
3   I currently live at 4535 Parnell Drive, Sarasota, Florida.
4        I was employed as an Administrative Assistant by
5   the Long Property Group in Sarasota in February and
6   March, 1998. During my employment there, I became
7   acquainted with Brad E. Long, Nicole N. Skaggs and
8   Steven M. Tucci.
9        I have reviewed the 3 page document titled
10  "Guaranty" which is attached to this statement. This document
11  is dated February 25, 1998. I have never seen this
12  document before. I never witnessed anyone sign this document.
13  I never signed this document as a witness on page 2 or on
14  page 3, the "acknowledgement."
15       I have also reviewed the document titled "Transfer
16  of Franchise Agreement and Area Development Agreement," which
17  is also attached to this statement. This is a 3 page document
18  with page 3 dated February 28, 1998. I have never seen
19  this document before. I never witnessed anyone sign this
20  document. I never signed page 3 of this document as a witness.
21       I have voluntarily given this statement to Rodney
22  K. McHargue of McHargue and Associates Investigative Services
23  and it is truthful to the best of my knowledge.
24
25
26
27
28
29
30  DATE: March 23, 2000  SIGNATURE: _____

WITNESS: Rodney K. McHargue  _____

EXHIBIT D

# GUARANTY

In consideration of Franchisor executing the foregoing Transfer of Franchise and Development Agreement transferring the Franchise and Development Agreement to SARASOTA SPORTS, INC. ("Developer/Franchisee"), dated ___3___  ___2_____, 19 9 8 , and for other good and valuable consideration, I, we, and each of us solidarily, jointly and severally, absolutely and unconditionally guarantee to Franchisor, (i) the payment and satisfaction of each and every claim, demand, default, liability, indebtedness, right or cause of action of every nature whatsoever, against said Developer/Franchisee, including expenses, damages and fees, now or hereafter existing, due, or to become due, or held by Franchisor, its subsidiaries, affiliates or divisions, together with any interest as it may accrue and if this continuing guaranty is placed with an attorney or if collected by suit or through any probate, bankruptcy or other court, to pay all court costs and reasonable attorney's fees, together with any and all expenses incurred by Franchisor or its affiliates, subsidiaries or divisions; and (ii) the timely performance of each term, covenant, and obligation of the Developer/Franchisee set forth in the Area Development Agreement and/or Franchise Agreement. The undersigned specifically acknowledge that Franchisor is allowing the undersigned to enter into this Guaranty Agreement instead of individually executing the Area Development Agreement and/or Franchise Agreement as a matter of convenience to the undersigned, and the undersigned agree to be bound by the provisions of the Area Development Agreement and/or Franchise Agreement relating to non-competition and confidentiality as if those provisions were fully set forth herein. This is a continuing guaranty which shall apply to the Area Development Agreement and/or Franchise Agreement and any subsequent amendments or modifications thereof, and such modifications or amendments shall be conclusively presumed to be covered by this guaranty without further notice to or acceptance by the undersigned.

The undersigned acknowledge and agree that possession of this guaranty by Franchisor constitutes true and correct execution and actual and proper delivery of same to Franchisor and the undersigned waive notice of acceptance of the guaranty and of any liability to which it applies or may apply, and waive presentment and demand for payment thereof, notice of dishonor or non-payment thereof, collection thereof including any notice of default in payment thereof or other notice to, or demand of payment therefor on, any party. Payment by the undersigned shall be made at the office of Franchisor in Kenner, Louisiana, or such other location as Franchisor may designate in writing.

Franchisor may, at its option, at any time without the consent of or notice to the undersigned, without incurring responsibility to the undersigned, and without any terms or conditions and in whole or in part, (1) change the manner, place or terms of payment or change or extend the time of payment of, renew, or alter any liability of the Developer/Franchisee under the Area Development Agreement and/or Franchise Agreement hereby guaranteed, or any liabilities incurred directly or indirectly hereunder, and the guaranty herein made shall apply to the liabilities of the Developer/Franchisee, so changed, extended, renewed or altered; (2) exercise or refrain from exercising any rights against Developer/Franchisee or others, or otherwise act or refrain from acting; (3) settle or compromise any liabilities hereby guaranteed or hereby incurred, and may subordinate the payment of all or any part of such liabilities to the payment of any liabilities which may be due to Franchisor or others; and (4) apply any sums paid to any liability on liabilities of Developer/Franchisee to Franchisor regardless of what liability or liabilities of Developer/Franchisee to Franchisor remain unpaid. Franchisor may, at its option, without the consent of or notice to the undersigned, apply to the payment of the liability created by this guaranty, at any time after such liability becomes payable, any monies, property, or other assets belonging to the undersigned in the possession, care, custody and control of the Franchisor.

This agreement shall not affect in any manner the right of the Franchisor to terminate the Area Development Agreement and/or Franchise Agreement pursuant to the terms thereof and this guaranty shall

* 1 *

TRNS.COMP
KKS95

survive the termination, expiration or cancellation of the Area Development Agreement and/or Franchise Agreement. Franchisor may, at its option, elect to take no action pursuant to this guaranty or the Area Development and/or Franchise Agreement without waiving any rights under either. The undersigned do further agree that it will not be necessary for Franchisor, in order to enforce the terms of this Agreement against them, to first institute suit or exhaust its remedies against the Developer/Franchisee or any others. The foregoing guaranty shall be irrevocable, except with the express written consent of the Franchisor.

The undersigned, if more than one, shall be solidarily and jointly and severally liable hereunder and the term "undersigned" shall mean the undersigned or any one or more of them. Anyone signing this guaranty shall be bound thereto at any time. Any married person who signs this guaranty hereby expressly agrees that recourse may be had against his or her separate property for all his or her obligations under this guaranty.

This guaranty shall bind and inure to the benefit of the heirs, executors, administrators, successors and assigns of Franchisor and the undersigned. This agreement in the possession of the Franchisor will be presumed that same has been executed and delivered by each of the undersigned for a valuable consideration.

WITNESS our hands at _____ on this the 25 day of _____ 19 97.

WITNESSES:

_____                    _____
                                                      **Brad Long**
_____                    Owner of 67% interest in Developer/Franchisee

_____                    _____
                                                      **Steven M. Tucci**
_____                    Owner of 33% interest in Developer/Franchisee

                                                      ACCEPTED BY:
                                                      Smoothie King Franchises, Inc.
_____
                                                      By _____
_____                    Joseph D. Davis, President

                                                      Date: 3-3-97

# ACKNOWLEDGMENT

STATE OF _____Florida_____

PARISH/COUNTY OF _____Sarasota_____

BEFORE ME, the undersigned authority, duly commissioned, qualified and sworn within and for the State and Parish/County aforesaid, personally came and appeared BRAD E. LONG and STEVEN M. TUCCI who being by me first duly sworn, did depose and say:

That appearer(s) is/are the identical person(s) who executed the foregoing TRANSFER OF FRANCHISE and DEVELOPMENT AGREEMENT and GUARANTY; that appearer(s) executed said instrument of appearer's(s') own free will and accord for the uses, purposes and benefits therein expressed.

IN WITNESS WHEREOF, said appearer(s) has/have executed this acknowledgment in my presence and in the presence of the undersigned competent witnesses on this ___25___ day of _____February_____, 19_98_.

WITNESSES:

BY: _____
Brad E. Long

BY: _____
Steven M. Tucci

_____
NOTARY PUBLIC

My commission expires ___7/20/98___

DAWN G. LeBLANC
Notary Public, State of Florida
My Comm. Expires July 20, 1998
No. CC 534694
Bonded Thru Official Notary Service

[SEAL]

TUCCI-CORP
Klong

• 3 •

Unit No. 149
Dev. Area No. 52

# TRANSFER OF FRANCHISE AGREEMENT
## and
## AREA DEVELOPMENT AGREEMENT

THIS AGREEMENT is made effective this _25_ day of _February_, 19 _98_, by and between Smoothie King Franchises, Inc., a Louisiana corporation, whose principal place of business is 2400 Veterans Memorial Boulevard, Suite 110, Kenner, Louisiana 70062 (hereinafter "Smoothie King" or "Franchisor"); and BRAD E. LONG, whose principal place of business is 3800 Tamiami Trail, Sarasota, FL 34239, (hereinafter collectively referred to as "Transferor"); and SARASOTA SPORTS, INC., (hereinafter referred to as "Transferee"), a Florida corporation, represented herein by its duly authorized agent and representative.

### WITNESSETH:

WHEREAS, on March 24, 1997, Smoothie King and Transferor entered into a written area development agreement ("Development Agreement") by the terms of which Transferor was granted the right to establish and operate a designated number of Smoothie King franchises in a specified area; and

WHEREAS, on March 24, 1997, Smoothie King and Transferor entered into a written franchise agreement ("Franchise Agreement") by the terms of which Transferor was granted a license to operate a Smoothie King Franchise in connection with the Franchisor's System and Proprietary Marks ("Franchise"); and

WHEREAS, Transferor desires to assign, transfer, and convey all of its right, title and interest in and to the Development Agreement, Franchise Agreement, and any agreements related thereto, to Transferee, a corporation formed for the convenience of ownership, and Franchisor is willing to consent to the transfer, upon the terms and conditions in the Franchise Agreement and upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1.  Transfer.  Subject to the provisions contained herein, Transferor hereby assigns, transfers and conveys all of its right, title and interest in and to the Development Agreement, Franchise Agreement, and any agreements related thereto, to Transferee.  Franchisor consents to the transfer subject to the terms and conditions in the Development Agreement and Franchise Agreement and upon the terms and conditions set forth herein.

2.  Transferee's Obligations.  Transferee hereby assumes and agrees to faithfully discharge all of Transferor's obligations under the Development Agreement and Franchise Agreement entered into

TRNS-CORP
BLong

* 1 *



DEPOSITION
EXHIBIT

by and between Franchisor and Transferor including, but not limited to, obligations incurred prior to the effective date of the transfer and the provisions of the Development Agreement and Franchise Agreement relating to non-competition and confidentiality.

3. <u>Guaranty by Transferor</u>.  Transferor hereby agrees to guarantee the full and complete performance of all obligations under the Development Agreement and Franchise Agreement, and Transferor specifically agrees to be bound by the provisions of the Development Agreement and Franchise Agreement relating to non-competition and confidentiality.  Concurrently herewith, Transferor agrees to execute the guaranty agreement attached hereto.

4. <u>Representations</u>.  Transferor and Transferee represent that Brad E. Long and Steven M. Tucci are shareholders of Transferee and each own in excess of 10% of the stock or ownership interest in Transferee.

5. <u>Execution of Documents</u>.  The parties agree to execute any and all documents or agreements and to take all action as may be necessary or desirable to effectuate the terms, covenants and conditions of this Agreement.

6. <u>Binding Effect</u>.  This Agreement shall be binding upon the parties hereto, their heirs, executors, successors, assigns and legal representatives.  Each party represents and warrants that they are duly authorized to enter into this Agreement on behalf of the party they represent.

7. <u>Attorney Fees</u>.  In the event any party retains legal counsel to enforce any provision of this Agreement, the prevailing party in any proceeding shall be entitled to recover its damages, costs and expenses, including reasonable legal fees.

8. <u>Severability</u>.  If any provision of this Agreement or any part thereof is declared invalid by a court of competent jurisdiction, such act shall not affect the validity of this Agreement and the remainder of this Agreement shall remain in full force and effect according to the terms of the remaining provisions or part of provisions hereof.

9. <u>Applicable Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana.

IN WITNESS WHEREOF, this agreement is made effective on the day and year first above written.

WITNESSES                                       Smoothie King Franchises Inc.


Barbara Robertson


Vanessa Worley                    By: _____
                                      Joseph M. Lewis, President

                                  Date: _____3-2-98_____


TRNS-CORP
BLong

**TRANSFEROR:**

By: _Brad E. Long_

Brad E. Long

Date: _2/28/78_

**TRANSFEREE:**

**Sarasota Sports, Inc.**

By: _____

Its duly authorized _President_ (title)

Print name: _Brad E Long_

Date: _2/25/98_

TRNS-CORP
BLong

* 3 *

# AFFIDAVIT

**STATE OF FLORIDA**
**COUNTY OF SARASOTA:**

     **BEFORE ME,** the undersigned authority, personally appeared Dawn LeBlanc who, after being duly sworn, deposes and says as follows:

     1.     That I am over the age of eighteen and that I have personal knowledge of all facts stated herein.

     2.     That I worked in an office located at 2033 Wood Street, Sarasota, Florida from the Fall of 1996 until the Fall of 1997.

     3.     That said office was subleased from Long Property Group, Inc.

     4.     That Brad Long worked at Long Property Group, Inc., and I knew him personally.

     5.     That I had seen Steven Tucci on several occasions in the Long Property Group office, but did not know him prior to seeing him on those occasions.

     6.     That on a number of occasions Brad Long presented me with documents and asked me to notarize signatures on them.

     7.     That on a number of occasions, one of the signatures I was requested to notarize was that of Steven Tucci.

     8.     That on the occasions when Brad Long asked me to notarize Steven Tucci's signature, he told me that Mr. Tucci did sign the documents and that it needed to be notarized.

     9.     Based upon Mr. Long's representations, I notarized the documents.

     10.     That I have never observed Mr. Tucci sign any document.

     11.     I have reviewed the document attached hereto which is titled, "Guarantee

**EXHIBIT E**

Agreement and recognize my signature as the notary.

      12.    That I did not observe Mr. Tucci sign said document.

      13.    That I never asked Mr. Tucci whether he signed any document.

FURTHER AFFIANT SAYETH NAUGHT.


_____
DAWN LeBLANC


**STATE OF FLORIDA**
**COUNTY OF SARASOTA:**

    THE FOREGOING was acknowledged before me this 14th day of January 1999,
by DAWN LeBLANC, who is personally known to me, or who produced
_____ as identification and who did take an
oath.


_____
NOTARY PUBLIC


CATHERINE GIBBS MAYER
COMMISSION # CC 49565
EXPIRES OCT 05, 1999
BONDED THRU
ATLANTIC BONDING CO., INC.